IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------X

UNITED STATES ex. Rel.

WENDY MORALES,

                              Plaintiff,           FILED UNDER SEAL

v.

                                         Pursuant to 31 U.S.C. § 3730(b)(2)

TCPRNC, LLC d/b/a THE PLAZA REHAB
AND NURSING CENTER and

JILLIAN CLARK,

                                         Civil Action No. _____

                            Defendants.

-----------------------------------------------------------------X

        On behalf of the United States of America, and pursuant to the *qui tam* provisions of the United States False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, Plaintiff-Relator Wendy Morales ("Relator"), by and through the undersigned counsel, files this *qui tam* Complaint for treble damages and civil money penalties against TCPRNC, LLC d/b/a The Plaza Rehab and Nursing Center ("The Plaza") and Jillian Clark (collectively, "Defendants").

## **INTRODUCTION**

        1.      This is an action to recover treble damages and civil penalties on behalf of the United States arising from false and/or fraudulent statements, records, and claims made, or caused to be made by Defendants and/or its agents and employees.

        2.      This *qui tam* case is brought against Defendants for submitting and/or causing the submission of false claims by knowingly disenrolling Relator's grandfather, Juan Zayas –

and others, upon information and belief – from Medicare Advantage ("MA") coverage without his – or his legal representative's – authorization or consent.

## JURISDICTION AND VENUE

3. The Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1345, and 31 U.S.C. § 3732.

4. This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because Defendants can be found, reside, or transact business in this District. In addition, this Court has personal jurisdiction over Defendants because acts prohibited by 31 U.S.C. § 3729 occurred in this District.

5. Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because Defendants transact business in this District, and numerous acts proscribed by 31 U.S.C. § 3729 occurred in this District.

## THE PARTIES

6. Relator Wendy Morales is a special needs teacher residing in New York. Relator is the granddaughter and authorized healthcare proxy for Juan Zayas.

7. Juan Zayas is an 83 year-old resident of Bronx, New York. Between December 2017 and February 2018, Zayas was a patient and resident at The Plaza.

8. Relator brings this action based on her direct, independent and personal knowledge, and also upon information and belief. Relator is an original source of this information to the United States. She has direct and independent knowledge on which the allegations are based, and has voluntarily provided the information to the Government before filing an action under the False Claims Act which is based on the information. In addition, in a separate document, Relator has disclosed to the Government all relevant information related to this Complaint.

9. Defendant TCPRNC, LLC d/b/a The Plaza Rehab and Nursing Center is a New York limited liability company and has, at all relevant times, been engaged in the owning, operating, managing, and supervising of a nursing home facility located at 100 West Kingsbridge Road, Bronx, NY 10468.

10. At all times relevant to this Complaint, The Plaza was certified by Medicare as a Skilled Nursing Facility ("SNF") and provided skilled nursing services to beneficiaries of Medicare.

11. On information and belief, The Plaza is, and was at all times relevant to this action, a "Participating Provider" as defined in Title 42 of the Code of Federal Regulations in that The Plaza had entered into Participating Provider Agreements with the United States. Pursuant to the Provider Agreements, The Plaza agreed to accept assignments of monies paid for Medicare beneficiaries, and such payments were made directly to the The Plaza.

12. At all times relevant to this Complaint, Defendant Jillian Clark was Director of Admissions for The Plaza.

## I. STATUTORY AND REGULATORY FRAMEWORK

### A. Medicare

13. Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395 *et seq.* established the Health Insurance for the Aged and Disabled Program ("Medicare").

14. The Medicare program was a federally operated and funded insurance program administered by the Department of Health and Human Services ("HHS") through its Centers for Medicare and Medicaid Services ("CMS"). 42 U.S.C. §§ 1395 *et seq.*

15. The Medicare program was comprised of four parts, but only Part A and Part C are relevant to this action. Part A – together with Part B known as "Original Medicare" –

provided hospital insurance for eligible individuals at Participating Providers, including: (i) hospital care; (ii) skilled nursing care; (iii) nursing home care; (iv) hospice; and (v) home health services. Accordingly, Part A covered skilled nursing care provided in a SNF under certain conditions for a limited time.

16. A SNF was an institution, such as a skilled nursing home or rehabilitation center, which had a transfer agreement in effect with one or more Medicare participating hospitals that: (i) "[wa]s primarily engaged in providing skilled nursing care and related services for residents who require medical or nursing care; or rehabilitation services for the rehabilitation of injured, disabled, or sick persons," and (ii) met "the requirements for participation in 1819(a) through 1819 (d) as amended by 4201 of OBRA 1987 of the Social Security Act and in regulations at 42 CFR 483, B."[1]

17. Subject to certain eligibility conditions, Part A provided a Medicare beneficiary with up to 100 days of skilled nursing and rehabilitation care at a SNF for a benefit period (*i.e.*, spell of illness) following a qualifying hospital stay of at least three consecutive days. 42 U.S.C. § 1395d(a)(2)(A); 42 C.F.R. § 409.61(b), (c).

18. The conditions that Medicare imposed on Part A SNF benefits required that: (i) the patient was covered by Part A and has days left in the benefit period; (ii) the patient had a qualifying hospital stay of at least three consecutive days; (iii) a physician determined that the patient requires daily skilled care given by, or under the direct supervision of, skilled nursing or therapy staff; (iv) the patient received the skilled services in a SNF that was certified by

---

[1] CMS, *Medicare General Information, Eligibility, and Entitlement (Chapter 5 – Definitions)*, *available at* https://www.cms.gov/regulations-and-guidance/guidance/ manuals/ downloads/g 101c05.pdf.

4

Medicare; and (v) the services were needed to treat a hospital related medical condition or a condition that arose while being treated at a SNF for a hospital related medical condition.

19. Under Part A, CMS reimbursed SNFs using a fee-for-service ("FFS") payment system. SNFs electronically submitted claims to CMS for reimbursement for each service during a stay at a SNF. CMS then paid the SNF directly for each service.

20. To bill Medicare under Part A, SNFs submitted the Uniform Bill, form CMS-1450, electronically to Medicare payment processors.

21. Under Part A, a beneficiary did not have a co-payment for the first 20 days, but accrued a daily co-payment of $167.50 for days 21 through 100. After 100 days, the beneficiary covered all costs for all further billed services.

22. Under Part C – commonly known as Medicare Advantage Plans ("MAP") – beneficiaries could opt-out of Original Medicare and enroll in an MAP offered by private companies approved by Medicare. MAPs covered all services provided under Original Medicare, including stays at SNFs.

23. Under Part C, the Medicare program paid private insurers a set amount to care for each beneficiary known as a per-member, per-month ("PMPM") payment. The SNF then billed the private insurer on the MAP for reimbursement.

24. Upon information and belief, SNFs – including The Plaza – received greater total payment for the same skilled nursing facility care under Part A than under Part C since SNFs received the full amount billed under Part A, but only the contracted amount under the MAP.

    *b.* ***The False Claims Act***

25. The False Claims Act, in pertinent part, provides that any person who:

  A. knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; [or]

  B. knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim…

* * *

is liable to the United States Government [for statutory damages and such penalties as are allowed by law].

31 U.S.C. § 3729(a)(1) -(2) (2006), *as amended by* 31 U.S.C. § 3729(a)(1)(A)-(B).

26. The False Claims Act further provides that "knowing" and "knowingly"

  A. mean that a person, with respect to information-

- has actual knowledge of the information;
- acts in deliberate ignorance of the truth or falsity of the information; or
- acts in reckless disregard of the truth or falsity of the information; and

  B. require no proof of specific intent to defraud[.]

31 U.S.C. § 3729(b) (2006), as amended by 31 U.S.C. § 3729(b)(1).

27. The False Claims Act, at 31 U.S.C. § 3729(a)(1), provides that a person is liable to the United States Government for three times the amount of damages which the Government sustains because of the act of that person, plus a civil penalty of $5,500 to $11,000 per violation.

## II. AGREEMENTS WITH MEDICARE

28. Upon information and belief, The Plaza entered into one or more agreements with the United States in order to become a participant in the Medicare program and certification as a SNF.

29. Pursuant to these agreements, The Plaza agreed to accept assignments of monies paid for Medicare beneficiaries, and these payments were made directly to The Plaza. Furthermore, The Plaza agreed to submit only truthful and accurate claims for reimbursement.

### III. DEFENDANTS' FRAUDULENT DISENROLLMENT OF BENEFICIARIES FROM MEDICARE ADVANTAGE

30. A Medicare beneficiary under Part C was permitted to disenroll from his or her MAP, automatically returning the beneficiary to Original Medicare (i.e., Parts A and B) coverage.

31. For beneficiaries at a SNF, though, only the beneficiary – or the beneficiary's legal representative or party authorized to act on behalf of the beneficiary under state law – can request *voluntary* disenrollment from a MAP. Accordingly, a SNF could not *involuntarily* disenroll a beneficiary from a MAP without the beneficiary's or their representative's knowledge and/or consent. Such an action was a violation of regulatory requirements.[2]

32. Upon information and belief, because The Plaza was reimbursed significantly more money for beneficiaries under Original Medicare than MAP for the same skilled nursing facility services, Defendants fraudulently disenrolled beneficiaries – including Juan Zayas – from their MAP and returned them to Original Medicare without their consent to or knowledge of the disenrollment.

33. For each claim Defendants submitted to Medicare, Defendants certified that if it "knowingly file[d] a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under the law and may be subject to civil penalties."

34. Defendants were aware of, or should have been aware of, the conditions for repayment under Part A.

---

[2] CMS, *Memo to Long Term Care Facilities on Disenrollment Issue* (May 26, 2015), *available at* https://www.cms.gov/Medicare-Medicaid-Coordination/Medicare-and-Medicaid-Coordination/Medicare-Medicaid-Coordination-Office/FinancialAlignmentInitiative/Downloads/LTCFDisenrollmentMemo052615.pdf.

35. Defendants have provided skilled nursing facility services to Medicare beneficiaries (among others) since at least 2015.

36. Since at least December 2017, and upon information and belief since 2015, Relator believes that Defendants regularly and unlawfully disenrolled Medicare beneficiaries from MAP without their consent, knowledge or understanding as required by regulatory requirements.

37. Upon information and belief, Defendant has submitted or caused to be submitted claims for reimbursement for these involuntarily disenrolled beneficiaries to the United States, through its carriers and intermediaries.

38. The claims should have been submitted to the relevant private insurer for the beneficiaries' MAP, not Medicare.

39. Upon information and belief, any documentation submitted with these claims indicating that the beneficiaries were covered by Original Medicare was false and/or fraudulent.

40. Upon information and belief, in reliance upon the information and representations contained in these claims, the United States, through its carriers and intermediaries, made payments to The Plaza and has been damaged in an amount to be determined.

41. The United States is entitled to treble its actual damages and to civil penalties in the amount of approximately $11,000 to $22,000 for each of the false claims submitted.

### A.  *Example of the Fraudulent Practice*

42. From approximately December 14, 2017 through February 22, 2018, Juan Zayas was a patient and resident of The Plaza while recovering from an injury sustained during a fall.

43. During all relevant times, Relator served as Zayas' authorized healthcare proxy legally permitted and obligated to make healthcare decisions on Zayas' behalf.

44. At the time of his admission, Zayas was enrolled in a MAP through UnitedHealthcare ("Private Plan").

45. It was Relator's and Zayas' understanding and intent that all services provided by Defendants be billed to the Private Plan.

46. Unlike Part A, under the Private Plan, Zayas had no daily co-insurance for a stay up to and including 100 days at a SNF.

47. Accordingly, under the Private Plan, Zayas was not responsible for any co-payment or deductibles during his stay.

48. Upon information and belief, Defendants submitted claims to UnitedHealthcare for services provided to Zayas between December 14 and 31, 2017, totaling $11,741.10.

49. Upon information and belief, while UnitedHealthcare initially denied the claim as improperly submitted, UnitedHealthcare was contracted to pay Defendants only $8,280 of the entire billed amount for January 2018, once properly resubmitted.

50. Upon information and belief, effective January 1, 2018, Defendants involuntarily disenrolled Zayas from the Private Plan, which automatically enrolled him in Original Medicare.

51. Upon information and belief, once Zayas was enrolled in Original Medicare, Defendants would receive the full claimed amount from Medicare, rather than the lower contracted amount from UnitedHealthcare.

52. Neither Relator, nor Zayas consented to, authorized or had any knowledge of the disenrollment by Defendants.

53. Indeed, to Relator's surprise, on or about January 19, 2018, Defendants contacted Relator to pressure her into applying for Medicaid to cover Zayas' daily co-payment of $167.50. Defendants did not explain the reason for the sudden co-payment or that it resulted from Zayas'

disenrollment in the Private Plan. Nonetheless, Relator informed Defendants that Zayas was not eligible as his income exceeded the Medicaid threshold.

54. Accordingly, Relator and Zayas never applied for Medicaid coverage.

55. Confused by the daily co-payment, Relator contacted UnitedHealthcare to inquire about the sudden and significant daily co-payment. At that time, Relator first learned from UnitedHealthcare that Zayas had been disenrolled from the Private Plan.

56. Neither Relator nor Zayas authorized or had any knowledge of the disenrollment from the Private Plan.

57. Relator then contacted Defendant Clark, Director of Admissions for The Plaza, asking how Zayas could be involuntarily disenrolled from the Private Plan. Defendant Clark claimed Zayas had voluntarily elected to disenroll from the Private Plan. Relator, however, relayed that Zayas was completely unaware of the disenrollment, unable to make such a decision on his own, and would not have consented to it given the co-payment. After further questioning on the disenrollment and daily co-payment, Defendant Clark informed Relator that Zayas would not be responsible for any co-payments despite Defendants' earlier inquiry about Medicaid. Indeed, Defendant Clark later confirmed in email communications with Relator that Zayas would not be responsible for the daily co-payment.

58. Despite Zayas' involuntary disenrollment by Defendants and Relator's assurance to Defendant Clark that Zayas never disenrolled from the Private Plan, Defendants continued to bill Medicare instead of UnitedHealthcare for services provided in January and February 2018.

59. Upon information and belief, Defendants submitted claims to Medicare for services provided to Zayas between January 1 and 31, 2018, totaling $27,294.93.

10

60. Upon information and belief, Medicare paid the entire billed amount for January 2018 to Defendants.

61. Upon information and belief, Defendant submitted claims to Medicare for services provided to Zayas between February 1 and 22, 2018.

62. Upon information and belief, Medicare paid the entire billed amount for February 2018 to Defendants.

63. Despite Defendant Clark's concession and assurances that Zayas would not have any co-payment or deductible during his stay, on or about February 16, 2018, Defendants sent Relator a Notice of Medicare Non-Coverage notifying Relator and Zayas that the "last day of coverage with Medicare Part A will be on 02/21/18," and would not cover his final day of services. The notice stated the estimated cost of services would be $492 for daily room and board on the day of Zayas' discharge. Adding further confusion, the notice stated that Zayas' other insurance was through Medicaid, but made no mention of the Private Plan. To be sure, Zayas was not eligible and never applied for Medicaid coverage.

64. On or about February 22, 2018, Zayas was discharged by Defendants into the care of Relator. At the time of discharge, Relator again confronted Defendants about Zayas' involuntary disenrollment from his Private Plan. Defendant Clark maintained that the disenrollment was authorized by Zayas. As proof, Defendant Clark presented Relator with a "Disenrollment Form," dated December 28, 2017, purportedly acknowledged and signed by Zayas.

65. Zayas, however, never signed the Disenrollment Form. Rather, the Disenrollment Form included a clearly forged – and misspelled – signature for Relator.

66. At discharge, Relator also requested a letter from Defendants stating that Zayas was not responsible and would not be contacted for the accrued daily co-payment from Medicare of

$167.50. Defendant Clark provided such a letter in an attempt to prevent and preclude detection of Defendants fraudulent conduct.

### **COUNT ONE**

(VIOLATION OF THE FALSE CLAIMS ACT -- 31 U.S.C. § 3729(a)(1)(A))

67. Relator incorporates by reference and realleges all paragraphs of this Complaint set forth above as if fully set forth herein.

68. From at least in or about December 2017 through in or about February 2018, and upon information and belief since at least 2015 through the present, Defendants knowingly presented, or caused to be presented, and continue to present or cause to be presented, false and fraudulent claims for payment or approval to the United States – *i.e.*, the foregoing false and fraudulent claims for payments from Medicare – in violation of 31 U.S.C. § 3729(a)(1)(A).

69. Said false and fraudulent claims were presented with the Defendants' actual knowledge of their falsity, and with reckless disregard or deliberate ignorance of whether or not they were false.

70. The United States relied on these false and fraudulent claims, was ignorant of the truth regarding these claims, and would not have paid Defendants for these false and fraudulent claims had it known the truth of the falsity of the said Medicare claims by Defendants.

71. As a direct and proximate result of the false and fraudulent claims made by the Defendants, the United States has suffered damages and therefore is entitled to recovery as provided by the False Claims Act in an amount to be determined at trial, plus a civil penalty of approximately $11,000 to $22,000 for each such violation of the False Claims Act.

## **COUNT II**

(VIOLATION OF THE FALSE CLAIMS ACT -- 31 U.S.C. § 3729(a)(1)(B))

72. Relator incorporates by reference and realleges all paragraphs of this Complaint set forth above as if fully set forth herein.

73. From at least in or about December 2017 through in or about February 2018, and upon information and belief since at least 2015 through the present, Defendants knowingly made, used or caused to be made or used, and continue to make, use and cause to be made or used, false records or false statements material to the foregoing false or fraudulent claims such that these false or fraudulent claims would be paid and approved by the United States, in violation of 31 U.S.C. § 3729(a)(1)(B).

74. Defendants' knowingly false records or false statements were material, and upon information and belief continue to be material, to the false and fraudulent claims for payments they made and continue to make to the United States for Medicare reimbursements and benefits.

75. The Defendants' materially false records or false statements are set forth above and include, but are not limited to, certifications in the claims for payment (*i.e.*, CMS Form 1500).

76. These said false records and false statements were made, used or caused to be made or used, and continue to be made, used and caused to be made and used, with Defendants' actual knowledge of their falsity, and with reckless disregard or deliberate ignorance of whether or not they were false.

77. As a direct and proximate result of these materially false records or false statements, and the related false or fraudulent claims made by Defendants, the United States has suffered damages and therefore is entitled to recovery as provided by the False Claims Act in an amount to

be determined at trial, plus a civil penalty of approximately $11,000 to $22,000 for each such violation of the False Claims Act.

### COUNT III

(VIOLATION OF THE FALSE CLAIMS ACT -- 31 U.S.C. § 3729(a)(1)(G))

78. Relator incorporates by reference and realleges all paragraphs of this Complaint set forth above as if fully set forth herein.

79. From at least in or about December 2017 through in or about February 2018, and upon information and belief since at least 2015 through the present, the Defendants knowingly made, used or caused to be made or used false records or false statements, and continue to knowingly make, use or caused to be made false records or false statements, material to an obligation to pay or transmit money or property to the United States Government, or knowingly concealed and upon information and belief continue to conceal an obligation to pay or transmit money or property to the United States Government, or knowingly and improperly avoided or decreased, and upon information and belief continue to knowingly and improperly avoid and decrease, an obligation to pay or transmit money or property to the United States Government, in violation of 31 U.S.C. § 3729(a)(1)(G).

80. These said false records or statements were presented, and upon information and belief continue to be presented, with actual knowledge of their falsity, and with reckless disregard or deliberate ignorance of whether or not they were false.

81. As a direct and proximate result of these knowingly false records or false statements by the Defendant, the United States has suffered damages and therefore is entitled to recovery as

provided by the False Claims Act of an amount to be determined at trial, plus a civil penalty of approximately $11,000 to $22,000 for each violation of the False Claims Act.

## **CLAIM FOR RELIEF**

**WHEREFORE**, Plaintiff-Relator Wendy Morales, acting on behalf of and in the name of the United States, demands and prays that judgment be entered in favor of the United States against Defendants as follows:

A. Treble the United States' damages, in an amount to be determined at trial, plus a $22,000 penalty for each false claim submitted in violation of the False Claims Act;

B. Award of costs for this civil action; and

C. For prejudgment interest and for such other and further relief as the Court deems proper, just and equitable.

**MOREOVER**, Plaintiff-Relator Wendy Morales, on her own behalf, demands and prays that an award be made in her favor as follows: (a) for twenty-five percent (25%) of the proceeds collected by the United States if it intervenes in and conducts this action, or for thirty percent (30%) of the proceeds if the United States does not intervene; (b) for an amount for reasonable expenses necessarily incurred by the Relator in prosecution of this action; (c) for all reasonable attorneys' fees and costs incurred by the Relator; and (d) for such other and further relief to which the Relator may show herself justly entitled.

## **DEMAND FOR JURY TRIAL**

Relator hereby demands a jury trial.

                                      **CALCAGNI & KANEFSKY LLP**
                                      One Newark Center
                                      1085 Raymond Blvd., 14th Floor
                                      Newark, New Jersey 07102
                                      (T) 862-397-1796
                                      (F) 862-902-5458
                                      pkatz@ck-litigation.com

                                      By: _____
                                             Peter Katz, Esq.

Dated: October 18, 2018
       Attorneys for the Relator